# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
## ALEXANDRIA DIVISION

**SOFTECH WORLDWIDE, LLC,**

    **Plaintiff,**

**v.**                                        **Case No.  1:10-CV-651JCC/TRJ**

**INTERNET TECHNOLOGY
BROADCASTING CORP.,** *et al.*

    **Defendants.**

_____/

### INTERNET TECHNOLOGY BROADCASTING, CORP., DEFENDANT'S
### RESPONSE AND MEMORANDUM IN OPPOSITION TO
### PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Defendant, Internet Technology Broadcasting Corp. ("ITB"), files its Response in

Opposition to Plaintiff's, Softech Worldwide, LLC ("Softech"), Motion for Preliminary

Injunction ("Motion") (DE#81-82) and in support states:

### Summary of ITB's Legal Position

Softech is a rogue sub-subcontractor of the U.S. Department of Veterans Affairs ("VA"),

frivolously attempting through this action and its Motion to cripple the VA's operations and

damage the VA's longstanding relationship with ITB.  As explained herein, Softech has no legal

right to do what it is threatening to do: shut down key components of the VA's network.

Moreover, Softech has sat motionless for almost a year, strategically waiting until nearly the eve

of Christmas to file for this injunction in an attempt to extort ITB into settling this case.  Softech

cannot demonstrate a likelihood of success on the merits, irreparable harm, or that any equities

whatsoever favor its shortsighted legal maneuver.

The VA paid Softech, through ITB, nearly $3.3 million to develop software related to the

VA's remote learning and communication network.  There can be no dispute that Softech

installed copies of the Software, including the source code that comprises the Software, onto the VA's servers or that the VA owns copies of the Software it purchased.

Despite this, Softech alleges that ITB is engaging in improper use and copying of a laundry list of software. But, most of the "software" that Softech ran to the Copyright Office with, including the VSAT website and integration software for the VA's EDR and LMS programs, is "deadware," that has never been accessed or touched by ITB.

Likewise, with respect to DMA and CDN.NET, while Softech furnished fragments or artifacts, it never delivered any usable source code to ITB or the VA. Accordingly, ITB could not have copied, distributed, published or otherwise adapted or used that source code in any respect whatsoever. Again, there is no liability for copyright infringement.

This means that the **only** source code that ITB has modified is the updated version of CDN and the integration software for the VA-owned LC program. In that instance, however, the VA, as the owner of its copies of the source code, authorized ITB to perform whatever essential steps it needed to undertake in order to maximize and/or adapt the functionality of the Software in order to address the VA's ongoing needs. Because these are the only actions which ITB has ever undertaken in regard to Softech source code related to the CDN and LC, neither the VA nor ITB can be liable for copyright infringement because they are statutorily immune from liability under 17 U.S.C. §117.

In addition, even if this statutory defense was not available, the elements of implied license are abundantly present in this case: the VA requested that Softech create the Software and paid nearly $3.3 million to Softech for it, and Softech installed the Software onto the VA's servers intending, expecting and authorizing the VA, either itself or through its agents such as

ITB, to copy, distribute, use, retain and modify the Software as necessary to satisfy the VA's ongoing needs.

The law and the facts are clear that Softech, at a minimum, granted the VA an irrevocable license to use the Software at issue in this case.[1]  While Softech claims that it was receiving, and should continue to receive, an ongoing license fee, the documents actually show that Softech was already paid millions of dollars for its services, and was never promised ongoing payments in the future.  Having been paid to create Software for the VA, Softech at the very least granted an irrevocable license to continue to use the Software long after Softech's involvement was terminated.

Instead, Softech seeks to directly countermand these well-established principles.  Essentially, Softech argues that having provided these services to the VA, at the behest of ITB, it should be granted, *ex poste*, an ongoing license fee for Software work that was already bought and paid for.  Softech further argues that, to the extent the VA owns a license for the Software,[2] the VA, or its agents, cannot make changes to that Software necessary to keep the Software functioning.  Neither of these positions is supported by the law or the facts.

Having been granted an irrevocable license to use the Software that it paid for, the VA, whether itself or through anyone who it authorizes, is permitted under federal copyright law to take the "essential steps" necessary to keep that Software running properly on its computers and

---

[1] There is also a substantial question regarding whether, as a government subcontractor, Softech has granted a substantially greater license and/or ownership rights to the VA.  However, those issues are not germane to this motion, since there can be no question that the VA has at least an irrevocable license to use the Software.

[2] ITB will use the term "Software" to refer to the software referenced in Softech's complaint.  However, very limited portions of the alleged Software are in use by the VA, with the other pieces representing "deadware" that are not in use and for which no copying could ever be proven.

to adapt the Software to meet the VA's continually changing needs.   Once the VA Softech

(through ITB) to upload the Software to the VA's servers (a fact that cannot be disputed), the VA

was permitted to make changes to the Software to make it run on the VA's systems.   Any such

changes are, by definition, not infringement under the statute.

The only "evidence" Softech submitted in support of its alleged copyright infringement

claim is the Declaration of Nadeem Khan, and that does nothing to show that ITB, on behalf of

the VA, has done anything to alter or amend the Software beyond those changes necessary to

make them work on the VA's system.   Instead, the only evidence before the court is that ITB's

work in maintaining the functionality of the Software falls squarely within the statute's immunity

and, as such, precludes Softech's claims.

At the end of the day, the record reflects that Softech, already paid $3.3 million to

develop and maintain the VA's Software, is now trying to recoup lost revenue by seeking

payment in the form of a future license.   This is not permitted under the law, and is not supported

by the facts.   Softech cannot prevail in this suit and, as such, should not be granted the extreme

remedy it seeks in this belated motion for preliminary injunction.

## STATEMENT OF FACTS

### 1.      ITB and the VA's Pre-existing Media Content Delivery Software

ITB is a technology integrator and professional services firm that resells equipment and

provides network engineering software support to the VA.   (C. Davis Dec. ¶ 6.)   Under its sub-

contract for services to the VA.   ITB is responsible both for developing and maintaining the

software, including the source code, that it or its contractors, including Softech, installs onto the

VA's servers.   (A. Howard Decl. ¶ 5; C. Davis Dec. ¶ 7.)   As part of the development process,

the VA works in collaboration with ITB to develop software requirements, including the look,

feel, and functionality of the Software.  *Id.*  The VA relies entirely on ITB to maintain the functionality of the very specialized and very important software that it or its contractors install onto the VA servers.  *Id.*  If the Software fails, this could lead to catastrophic delays and breakdowns in business process and/or communication systems within the VA.  *Id.*

ITB's relationship with the VA started in 2001, when it began to develop what is now the backbone of the VA's medial delivery and communication system, its Content Delivery Network ("CDN") platform.  (A. Howard Decl. ¶ 6; C. Davis Dec. ¶ 8.)  By late 2001, ITB, along with Cisco Systems and Northrop Grumman, had designed, implemented, and supported the VA's CDN video-to-desktop solution to over 50,000 VA desktops.  *See* Jason Meserve, "Out-of-this-World Content Delivery Network," NETWORK WORLD, November 11, 2002, (describing ITB's role in the development of the VA's CDN) (**Ex. A**); (A. Howard Decl. ¶ 7; C. Davis Dec. ¶ 9.) By the time its relationship with Softech started, ITB had **already** implemented and configured a platform, CDN, to allow tens of thousands of users of the VA internal network to view instructional and information videos from their desktops.  *Id.*

**2.  The Software at Issue in this Dispute.**

Sometime in early 2002, ITB sought the services of a software developer to assist ITB with: (1) maintaining the CDN, including creating updates and revisions to the Software; and (2) integrating the VA's pre-existing software into the CDN.  *See* Emails dated February 25, 26, 2002 between Ann Howard and Nadeem Khan (**Ex. D**)  As evidenced by these first emails between the parties, ITB did not, as Softech appears to boast, seek out Softech's "premier" media

content delivery platform. Rather, ITB sought out programming services related to its pre-existing relationship with the VA.[3] *Id.*

### a.      EDR, LC, LMS, CDN and VSAT

Despite its claim to the contrary, Softech did not develop a single piece of Software that actually streams video to the desktop or caches video. Instead, Softech simply created an extremely small component of the VA CDN platform that allows previously existing VA-owned software to communicate with the Cisco-based CDN platform. (A. Howard Decl. ¶ 20; C. Davis Dec. ¶ 23.)

Softech did not develop the EDR ("Employee Data Record"), LC ("Learning Catalog") or LMS ("Learning Management System") Software. (A. Howard Decl. ¶¶ 14, 16; C. Davis Dec. ¶¶ 17, 19.) Instead, Softech developed software integrating, or allowing communication between, these pre-existing software programs and CDN. (A. Howard Decl. ¶¶ 15, 17; C. Davis Dec. ¶¶ 18, 20.) None of this integration software is in use because Softech's code was either never completed or is defective and unstable. *Id.*

---

[3] Softech attempts to give the Court the impression it is a company comparable in notoriety to, for example, Cisco Systems, when, in reality, Softech is a small, unsophisticated, sub-subcontractor that was brought onto this job as one of many, many parts of a conglomerate of companies servicing the VA's technology needs. (C. Davis Dec. ¶ 12.) Even more preposterous is Mr. Khan's self-serving statements in paras. 14-16 of his Declaration to the effect that Softech had already developed special software called "MCDP," had entered into an agreement with ITB to market that product, and that its "first customer was the VA." *See* Khan Dec. ¶¶ 14-16. Incredulously, Mr. Khan fabricates in his Declaration that Softech "created the first version of CDN software for the VA's use." *Id.* The facts are that Cisco Systems created CDN, it was installed on the VA's servers long before anyone had ever heard of Softech, and Softech would have never been involved in the VA's business had ITB not brought Softech into the fold long after ITB had secured the VA as ITB's customer. *See* (**Ex. A** at pp. 2-3); "Cisco Application and Content Networking System (ACNS) Software," *see also* (**Ex. B**); "Cisco IP/TV Software Version 5.1 Datasheet," (**Ex. C**); (C. Davis Dec. ¶ 14.). It is truly unbelievable to ITB that Mr. Khan and Softech's attorneys would so blatantly and unabashedly attempt to "pull the wool" over the Court's eyes in this fashion. (C. Davis Dec. ¶ 16.)

The updated version of the CDN, CDN v9.6.X (or simply, CDN) was developed by Softech under specific direction from the VA, through ITB.  (A. Howard Decl. ¶ 18; C. Davis Dec. ¶ 21.)  This software currently resides on the VA system and is being maintained to allow for its full and intended use.  *Id.*

Finally, while Softech actually was retained to develop VSAT ("Very Small Aperture Terminal"), it is not, as Softech suggests, software.  (A. Howard Decl. ¶ 19; C. Davis Dec. ¶ 22.)  Rather, VSAT consists merely of a single webpage that is incomplete.  Regardless, it is not in use.  *Id.*

### b.      CDN.NET and DMA

In late 2009, ITB instructed Softech to upgrade the outdated CDN v.9.6.X and to call the new software CDN.NET.  (A. Howard Decl. ¶ 21; C. Davis Dec. ¶ 24.)  CDN.NET was developed and then loaded onto a single isolated VA server.  (A. Howard Decl. ¶ 22; C. Davis Dec. ¶ 25.)  It is incomplete and has never been used.  *Id.*  Around the same time, ITB conceived of revolutionary next generation software for streaming digital media, which it called DMA ("Digital Media Architecture").  (A. Howard Decl. ¶ 23; C. Davis Dec. ¶ 26.)  Softech assured ITB that it had the ability, capability and experience to develop DMA for the application and software portion and ITB contracted with Softech to do so on this basis.  (A. Howard Decl. ¶ 24; C. Davis Dec. ¶ 27.)  When Softech proved unable to comply in any respect with its initial project plan to develop DMA, ITB sued Softech in Florida state court for, among other things, breach of contract.  (A. Howard Decl. ¶ 25; C. Davis Dec. ¶ 28.)

### 3.      Softech Installed Copies of the Software Onto the VA's Servers for the VA's Unrestricted Ownership and Use.

All integration software developed by Softech was required to be approved by ITB.  Once approved, the Software was deployed for testing and debugging onto the VA's "pre-

production" server.  (A. Howard Decl. ¶ 26; C. Davis Dec. ¶ 29.)  After the testing was finalized, Softech would redeploy the Software onto the VA's "production" servers for unrestricted use by the VA and its employees.  (A. Howard Decl. ¶ 27; C. Davis Dec. ¶ 30.)  During this process, Softech routinely communicated and interacted directly with the VA on behalf of ITB using ITB's signature block and the title, "VA CDN Application PM," which meant "Project Manager."  (**Ex. E**); (A. Howard Decl. ¶¶ 28-29; C. Davis Dec. ¶¶ 32-33.)

The source code was delivered and installed by Softech on the VA's server throughout ITB's and Softech's relationship with the express understanding of all three parties that the VA, which paid Softech nearly $3.3 million, would own its copies of the Software and source code.[4] (A. Howard Decl. ¶ 31; C. Davis Dec. ¶ 34.)  Never did Softech or its principals claim otherwise. (A. Howard Decl. ¶ 32; C. Davis Dec. ¶ 35.); *see also* Invoices submitted by Softech (**Ex. F**). This made sense because the nature of the development process meant the integration software, designed expressly for the VA's systems, is not commercially marketable outside of the VA.  *Id.*

### 4. Softech's Claims of Copyright Infringement Relating To EDR, LMS, CDN.NET, VSAT and DMA Are Patently False

As discussed above, the EDR, LMS, CDN.NET, and VSAT software created by Softech, including the source code, is unusable "deadware," which ITB has never even accessed or viewed, let alone maintained or copied.  (A. Howard Decl. ¶ 33; C. Davis Decl.¶ 41.)

As for the DMA source code that Softech supposedly developed, Softech at one time allowed ITB to access a file called "DMASource.ZIP," which contained only incomplete fragments of code, artifacts and hand-written diagrams.  (A. Howard Decl. ¶ 34-35; C. Davis

---

[4] Softech never reserved any right to repossess the Software it installed onto the VA's servers and Softech was paid in full for all of the software it installed on the VA's servers.  (C. Davis Dec. ¶ 37.)  Accordingly, Softech did not develop the Software and install it onto the VA's servers for anything other than a "forever," permanent basis.  *Id.*

Decl.¶ 42-43.)  This was despite the fact that ITB paid Softech hundreds of thousands of dollars over the course of just a few months for this work.  *Id*.  To date, Softech cannot point to any evidence in the record establishing that ITB was provided with DMA source code or that ITB copied that source code.[5] (A. Howard Decl. ¶ 36; C. Davis Decl.¶ 44.)

With regard to all of this Software or source code, ITB has unequivocally never copied, assisted others in copying, prepared derivative works, modified, distributed copies, performed, transmitted or displayed any of it, and Softech has presented no evidence to that effect.  (A. Howard Decl. ¶¶ 40-41; C. Davis Decl.¶¶ 47-48.)

### 5.    ITB is Engaged in Lawful Functionality Maintenance of CDN and LC on Behalf of the VA.

Since the time that the relationship between ITB and Softech was terminated, the only software that Softech developed that is currently used by the VA are the CDN software and the LC integration software.  (A. Howard Decl. ¶ 43; C. Davis Decl.¶ 50.)  Copies of that Software, including the source code, were installed by Softech onto the VA's servers for the VA to use. (A. Howard Decl. ¶ 44; C. Davis Decl.¶ 51.)   As the owner of its copies of Softech's LC integration software and copies of the revisions and maintenance updates to the CDN, the VA has instructed and authorized ITB to maintain the functionality of that Software, and, where appropriate, to adapt the Software for the VA's exclusive uses.  (A. Howard Decl. ¶ 46; C. Davis Decl.¶ 53.)  Accordingly, ITB's activities with respect to the CDN and LC software have been

---

[5] The Declaration of Nadeem Khan is the only "evidence" on this point that Softech relies upon. Mr. Khan states in ¶ 30 that certain "files related to progress on the DMA project" were downloaded by Ann Margaret Howard, the President of ITB, but provides no actual evidence that the DMA Software or source code was made available to, accessed, downloaded, copied, published, distributed or displayed in any manner by ITB.  (A. Howard Decl. ¶ 37; C. Davis Decl. ¶ 45.)  There is also no evidence supporting its claim on page 15 of its Brief that, "ITBC asserts that it has viewed source code for the DMA Software...while embarking on an attempt to create replacement software for it."  (A. Howard Decl. ¶ 12; C. Davis Dec. ¶ 15.)

limited solely to debugging and limited modifications (as directed by the VA) to support existing functions, or support changes in business needs.  (A. Howard Decl. ¶ 47; C. Davis Decl.¶ 54.)

## ARGUMENT

### I.  SOFTECH DOES NOT HAVE A LIKELIHOOD OF SUCCESS ON THE MERITS ON ITS COPYRIGHT INFRINGEMENT CLAIMS

As the Supreme Court has stressed again and again, a "preliminary injunction is an **extraordinary remedy**…"  *Winter v. Natural Resources Defense Council, Inc.*, 129 S. Ct. 365, 376 (U.S. 2008) (emphasis added).  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 374.  As discussed below, Softech fails to prevail on any of these elements, and its request for relief must be denied.

### A.  Softech's Integration Software for EDR, LMS, CDN.NET and VSAT is "deadware"

Softech seeks an injunction based on its copyright infringement claims relating to its integration Software for the VA-owned EDR, LMS, CDN.NET, VSAT, CDN and LC software. In order to prove copyright infringement, Softech must establish that ITB infringed one of Softech's rights under 17 U.S.C. §106.

As set forth in the Declarations of Craig Davis and Ann Margaret Howard, the software, and source code developed by Softech for EDR, LMS, CDN.NET and VSAT is unusable, unreliable, incomplete, and defective "deadware," which ITB has never maintained or copied. (A. Howard Decl. ¶¶ 11, 13, 14, 27; C. Davis Decl.¶¶ 14, 16, 17, 30.)  The only "evidence" presented by Softech in support of its claims of copying is the Declaration of Nadeem Khan,

which is devoid of any proof that ITB copied, distributed, performed, displayed or even accessed Softech's EDR, LMS, CDN.NET or VSAT deadware.

The closest Softech gets to an allegation of infringement with this Software is on page 15 of its Brief, where it states that "ITBC asserts that it has viewed source code for the CDN.NET Software." However, there is no actual evidence presented on this point. Accordingly, Softech cannot prove a likelihood of success on the merits of its copyright infringement claims concerning EDR, LMS, CDN.NET and VSAT.

**B.    Softech Never Delivered Source Code for DMA and Therefore Cannot Prove Copyright Infringement of its DMA Product.**

Softech alleges that ITB has prepared derivative works based on the purported 59 deliverables related to the DMA software that Softech submitted to Susan Haumeder, but the only "product" that Softech delivered, loaded onto a file called "DMASource.ZIP," consisted merely of artifacts and non-source code information, including hand-drawn diagrams and flow charts. Again, Softech has presented **no evidence** that ITB copied, prepared derivative works, or otherwise infringed Softech's rights in connection with its DMA product.

**C.    ITB Maintains Only the CDN and LC Integration Software, But is Statutorily Protected From Liability for Copyright Infringement Under 17 U.S.C. 117.**

Of the Software, ITB maintains only the CDN v.9.6.6 and LC Software on behalf of and as authorized by the VA.[6] Because it owns a license for the Software the VA is statutorily entitled to make copies of or otherwise make adaptations to a copy of these programs under the "essential step" defense under 17 U.S.C. § 117 of the Copyright Act, which provides, in pertinent part:

---

[6] As set forth above, EDR, LMS, CDN.NET and VSAT are "deadware" that has not been used by ITB since Softech was terminated.

> Notwithstanding the provisions of section 106, it is not an infringement for the owner of a copy of a computer program to make or authorize the making of another copy or adaptation of that computer program provided:
>
> (1)    that such a new copy or adaptation is created as an essential step in the utilization of the computer program in conjunction with a machine and that it is used in no other manner, or
>
> (2)    that such new copy or adaptation is for archival purposes only and that all archival copies are destroyed in the event that continued possession of the computer program should cease to be rightful.

*See Krause v. Titleserv, Inc.*, 402 F.3d 119 (2nd Cir. 2005).  S*ee also Stuart Weitzman, LLC, v. Microcomputer Resources, Inc,* 510 F.Supp.2d 1098 (S.D. Fla. 2007).  To come within the protection of the § 117(a)(1) affirmative defense, ITB must demonstrate that any adaptation made to CDN or the LC Software:

> (i) was made or authorized by the 'owner of a copy of [the] computer program'; (ii) was 'created as an essential step in the utilization of the computer program in conjunction with a machine"; and (iii) was 'used in no other manner.'  *Id.* at 122.

### 1.    The VA owns its copies of all Software and source code developed by Softech.

The determination of "ownership" of a copy of software does not depend on the presence or absence of formal title, but requires an analysis of whether the party seeking to be declared the owner "exercises sufficient incidents of ownership over a copy of the program to be sensibly considered the owner of the copy for purposes of § 117(a)" regardless of title.  *Krause,* 402 F.3d at 124.

In *Krause,* a software developer wrote over 35 computer programs (source code) for Titleserv over the course of 10 years.  *Id.* at 120.  The programs were installed on Titleserv's computer network and were accessible to Titleserv employees.  *Id.*  No written agreement

concerning licensing or ownership of the programs was ever reached. *Id.* Upon his departure, Krause left executable versions of all programs on the Titleserv servers, but locked them with a command that prevented converting executable code back into source code. *Id.* at 121. Krause told Titleserv that it was free to continue using the executable code as it existed on the day he left, but asserted that Titlesev had no right to modify the source code. *Id.*

In ultimately determining that Titleserv "exercise[d] sufficient incidents of ownership over a copy of the program to be sensibly considered the owner of the copy for purposes of § 117(a)," the Second Circuit found that: (1) Titleserv paid Krause substantial consideration to develop the programs; (2) Krause customized the software to serve Titleserv's operations; (3) the copies of the software were stored on a server Titleserv owned; (4) Krause never reserved the right to repossess the copies Titleserv used and agreed that Titleserv had the right to continue to possess and use the programs forever regardless of whether its relationship with Krause terminated; and (5) Titleserv was similarly free to discard or destroy the copies any time it wished. *Id.*; *see also Stuart Weitzman, LLC, v. Microcomputer Resources, Inc.,* 510 F.Supp.2d 1098, 1107-1109 (examining same factors). All of these factors are present here.

(1)     It is undisputed that the VA, through ITB, paid Softech a substantial sum of money (indeed, Softech was paid nearly $3.3 million since 2002) to develop the CDN revisional program (CDN v 9.6.6) and the LC integration software described in the First Amended Complaint and Motion for Preliminary Injunction.[7]  (A. Howard Decl. ¶ 32; C. Davis Decl. ¶ 35.)

(2) The CDN revision and the LC integration software were developed solely for the VA's use.  Indeed, the software that Softech developed allows the VA-owned programs such as

---

[7] It is of no importance that Softech was paid hourly rather than for a copy of the CDN or LC Software. *See Weitzman,* 510 F.Supp.2d at 1107.

LC, EDR and others to communicate with CDN.  These are systems that are unique to, and not commercially marketable outside of, the VA, but rather were "customized" for the VA's use.  (C. Davis Decl. ¶ 36.)

(3)     Softech installed all of its Software onto the VA's servers.  (A. Howard Decl. ¶ 31; C. Davis Decl. ¶ 34.)

(4)     There is no evidence that Softech ever reserved any right to repossess the Software it installed onto the VA's servers.  Indeed, Softech was paid in full for all of the Software it installed on the VA's servers.  There is simply no evidence that Softech developed the Software and installed it onto the VA's servers for anything other than a "forever" basis.  (C. Davis Decl. ¶ 37.)

(5)     The VA was free at any time to discard or destroy its copies of the Software installed onto its servers.  (C. Davis Decl. ¶ 38.)

While Softech may argue that §117(a) applies only to the VA and not to ITB, that argument ignores the plain language of the statute allowing the owner to make a copy, or to authorize another to make a copy on its behalf.  Here, the VA at all times authorized ITB to alter or modify the source code as necessary to address the VA's continuing needs, including fixing and debugging the Software as described in Mr. Davis' Declaration.  (C. Davis Decl. ¶ 39.)

2.   The VA has the right to authorize ITB to modify the
Software as part of an "Essential Step" in its utilization

The second step in the §117(a) analysis is to determine whether the modification of the programs was "an essential step in the utilization of the computer program[s] in conjunction with a machine."  The *Krause* court stated that adaptations were essential where they were necessary to use the programs for the very purpose for which they were purchased.

In *Krause,* there were four modifications at issue: (1) fixing "bugs"; (2) changing the source code to add new clients and other routine tasks needed to keep the programs up-to-date, (3) incorporating the programs into the Windows based system Titleserv designed, and (4) adding capabilities such as the ability to print checks and allow customers to access their records. Each of these adaptations was "essential" under § 117. *Krause* at 126-27.

Here, ITB has been authorized to make adaptations to the VA's copies of the CDN and LC Software. Accordingly, ITB's activities with respect to the CDN v9.6.6 and LC software have been limited to debugging and routine modifications (as directed by the VA) to support existing functions, or support changes in business needs. Examples include: (1) changing a web page to reflect the new "video of the week" and other cosmetic web page changes; (2) adding new field user account databases at the VA's request; (3) restarting a software process if it locks up or fails; (4) correcting software defects ("bugs") introduced in version 9.6.6 of the CDN Software as they are identified by VA users; (5) creating a new database field to support a VA reporting requirement (for instance, a reporting requirement as to "how many staff watched the 'Patient Privacy' video in the western region); (6) identifying and fixing content library errors such as the appearance of duplicate videos; (7) performing regular "integrity checks" of the database to insure that it is not corrupt; (8) fixing programs that may break when a Microsoft Patch is applied to the server; and (9) performing other routine tasks necessary to keep the programs up-to-date and to maintain their usefulness to the VA. (A. Howard Decl. ¶ 47; C. Davis Decl. ¶ 54.)

If anything, ITB's conduct does not even go as far as *Krause,* because ITB is simply performing maintenance to ensure that the programs continue to function properly and not

adding improvements.  Accordingly, the modifications performed by ITB (as authorized by the VA) fall squarely within the protection of § 117(a).

3.      The Software is "Used In No Other Manner."

Finally, § 117(a) requires that the adaptation created as an essential step in the utilization of a computer program in conjunction with a machine be "used in no other manner."  In *Krause,* the court found that use by Titleserv's subsidiaries did not constitute use *in another manner.*  The court reasoned that the programs designed for Titleserv were intended to run on Titleserv's file server, where they would be accessible to Titleserv's subsidiaries.  Thus, the use by the subsidiaries was merely a continuation of the kind of use for which the programs were intended.

Here, there is no evidence or allegation that any of the Software that Softech installed on the VA's servers is being used for any purpose other than as expressly authorized by the VA in order to maintain the functionality of the Software.  Indeed, the Software that Softech installed on the VA's servers, and any modifications or alterations of the source code, is solely for those purposes that are expressly authorized by the VA in order to maintain the functionality of the Software and to address the VA's continually changing needs.  Never has ITB used the subject Software, or made any copies, modifications, alterations or derivative works, for any purpose other than as legitimately directed by the VA for VA needs.  (C. Davis Decl. ¶ 40.)

Softech would argue that ITB's conduct exceeds the scope of what is allowed by law, but the cited case law on page 15 of its brief simply does not stand up to close inquiry.  Those cases either dealt with written licensing agreements that precluded the conduct complained of, or dealt with situations where there were substantial modifications to the software rather than simply maintenance.  For example, in *TracFone Wireless, Inc. v. SND Cellular, Inc*., 715 F. Supp. 2d 1246, 1259 -1260 (S.D. Fla. 2010), the so called "derivative work" (flashing a phone operating

system to "unlock it") directly conflicted with written license agreement that precluded the modification of that software in any way. *Id. Dun & Bradstreet Software Services, Inc. v. Grace Consulting, Inc.*, 307 F.3d 197, 212 (3rd Cir. 2002) involved the same situation, and also involved the copying and use of the work well beyond that necessary to the continued use of the program on the licensee's computers.   In both cases, the common law license had been substantially narrowed in writing by the parties.   This case is substantially different, and closer to *Vernor v. Autodesk, Inc.*, 621 F.3d 1102, 1114 (9th Cir. 2010), where the court held that the essential step defense applied to bug and maintenance fixes where, as here, there was no written license governing parties' conduct.[8]

D.   **Even if ITB Was Not Protected Under 17 U.S.C. § 117, Softech Granted an Irrevocable Implied License to the Copyrights Associated With its Software and Thus ITB Cannot Be Liable.**

Assuming, *arguendo*, that Softech is the creator and rightful owner of the copyrights to the CDN, EDR Software, LC Software, LMS Software, and VSAT (collectively, "Software"), which ITB does not concede, preliminary injunction should be denied because Softech granted the VA (and ITB, to the extent Softech delivered copies of the Software to ITB) an implied, nonexclusive license to use, modify, retain, copy and distribute the Software.   Although only the CDN v.9.6.6 and the LC Software are in use, the nature of the parties' relationship and the objective evidence of the parties' intent demonstrate that Softech intended to grant the VA a nonexclusive implied license in the Software for which Softech was adequately compensated.

---

[8] Softech also relies on *Midway Mfg. Co. v. Artic Intern., Inc.*, 704 F.2d 1009, 1014 (7th Cir. 1983) (holding a "speeded-up video game" was a "substantially different product") and SAS *Institute, Inc. v. S & H Computer Systems, Inc.*, 605 F. Supp. 816, 831 (D.C. Tenn. 1985) (modifying the software for an entirely new type of computer system was a substantially different use).   Those cases are very different from this one, where the only evidence on this point shows that ITB is simply maintaining the existing product's original functionality until a replacement is developed.

Although the Copyright Act requires a writing for all *exclusive* transfers of copyright, see 17 U.S.C. § 204(a), *nonexclusive* licenses do not constitute a transfer of ownership rights. Rather, they simply permit the use of a copyrighted work in a particular manner. *Holtzbrinck Publishing Holdings, L.P. v. Vyne Communications*, No. 97 CIV. 1082, 2000 WL 502860, at *4 (S.D.N.Y. April 26, 2000). As such, nonexclusive licenses are exempt from the writing requirement and may be granted orally or could be implied from the conduct of the parties. *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1235 (11th Cir. 2010). Indeed, the existence of an implied nonexclusive license is a complete defense to an allegation of copyright infringement. *Nelson-Salabes, Inc. v. Morningside*, 284 F.3d 505, 514 (4th Cir. 2002).

Courts apply a 3-part test to determine the existence of a nonexclusive, implied license in computer software, finding that such a license is granted when (1) a person (the licensee) requests the creation of the software, (2) the creator (the licensor) makes that particular work and delivers it to the licensee who requested it, and (3) the licensor intends that the licensee-requestor copy, distribute, use, retain, and modify the software. *See Thomas M. Gilbert Architects, P.C. v. Accent Builders and Developers*, *LLC*, 629 F. Supp.2d 526, 531 (E.D.Va. 2008) (*citing Nelson-Salabes, Inc. v. Morningside*, 284 F.3d 505, 514 (4th Cir. 2002)). *See also Asset Marketing Systems, Inc. v. Gagnon*, 542 F.3d 748, 754-55 (9th Cir. 2008); *Latimer v. Roaring Toyz, Inc.*, 601 F.3d at 1235; *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 776 (7th Cir. 2002).

As discussed below, these factors are readily met here. Softech's undisputed admissions, correspondence, and conduct throughout the course of its work with ITB demonstrate that it granted the VA, and anyone authorized by the VA, including ITB, an implied, nonexclusive license in both the CDN and the integration software related to the LC, EDR, and LMS software.

        1.     <u>The VA, as licensee, requested that Softech develop the Software</u>

In general, when the licensor does not create the works in question on its own initiative, but only creates them in response to the licensee's request, the first prong is satisfied. *Asset Marketing*, 542 F.3d at 755. The fact that the licensee initiates contact and makes a specific request is also sufficient as well. *See, e.g., Attig v. DRG, Inc.*, No. Civ.A. 04-CV-3740, 2005 WL 730681, at \*5 (E.D. Pa. March 30, 2005) (finding an email whereby defendant asked plaintiff to put information up online was a clear request for plaintiff to do work); *see also Dawson v. Brandsberg*, No. 6:06 CV 019, 2006 WL 2915234, at \*4 (W.D.Va. 2006) (when both parties agreed that plaintiffs initiated contact with defendant and requested registration of a domain name and web site, first prong was met).

ITB and Softech began their relationship in 2002 when ITB, as a subcontractor to the VA, sought the assistance of Softech in the development of software for the VA. *See* First Am. Compl., ¶ 21. During the relationship, ITB instructed Softech to write the source code according to VA requirements, and Softech presented the source code to ITB, which would either approve the code or request modifications based on the VA's requirements. This conduct clearly demonstrates that the VA requested Softech to develop the Software.[9]

## 2. Softech created and delivered the Software to the VA

The second prong of the implied license analysis requires a two-step inquiry. First, it must be determined for whom the software was created and then it must be determined whether the software was properly delivered. *See Asset Marketing,* 542 F.3d at 755-56 (holding it was

---

[9] Softech's claim to have slightly modified its existing MCDP to comply with VA requirements is illogical, impossible, and irrelevant to this element. As discussed previously, Softech's claim is discredited because the Software requested by ITB, on behalf of the VA, integrated pre-existing VA software into a highly complicated and secure VA platform. The process of tailoring the Software to the exact specifications required by the VA took months and did not entail a modification of pre-existing non-VA software.

"undisputed that Gagnon created these programs for AMS" despite Gagnon's assertion that the programs could be converted for use by another company); *c.f. Thomas M. Gilbert Architects, P.C. v. Accent Builders and Developers*, *LLC*, 629 F. Supp.2d 526, 531 (E.D.Va. 2008) (finding that elements of creation and delivery were satisfied).  The court in *Asset Marketing* held that Gagnon delivered the programs when he installed them on AMS computers and stored the source code on-site at AMS.  *Id.*  This is exactly what was done in the present case.

Softech argues in response to the implied license defense that it delivered the Software directly to the VA server rather than to ITB.  But, Softech obviously knows that the VA has contracted ITB to maintain the functionality of the Software, as the VA is permitted to do under its implied license.  Thus, delivery to the VA servers rather than directly to ITB is in fact a non-issue.  *Cf. Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1235-1236 (11th Cir. 2010) (finding parties who were commissioned to place custom paint on motorcycles and photograph motorcycles knew the work was ultimately for use by third-party Kawasaki; thus Kawasaki had also been granted a nonexclusive, limited license to, at a minimum, copy and distribute works in accordance with intent of parties); *MacLean Associates, Inc. v. Wm. M. Mercer-Meidinger-Hansen, Inc.*, 952 F.2d 769, 779 (3d Cir. 1991) (finding implied, nonexclusive license extended to use of system with third-party's account, when creator of system knew that it was being developed solely for use with that third-party's account).

It is also undisputed that Softech created the Software at ITB's request specifically for use by the VA.  As part of the development process, the VA worked in collaboration with ITB to develop software requirements, including look, feel, and functionality.  (A. Howard Decl. ¶ 5; C. Davis Decl. ¶ 7.)  ITB would then instruct Softech to write the source code.  Once Softech presented the code, ITB would review it prior to approval and then authorize Softech to release

the source code to the VA server.  Thus, the nature of the design process shows that Softech knowingly created the Software at ITB's request specifically for delivery and use by the VA.[10]

Softech also argues that the Software could be converted for use by another company. But, the VA's very specific software requirements essentially devalue any commercial use of the Software.  (Davis Decl. ¶ 36.)  This is not a circumstance where ITB can simply take Softech's work, which was designed for a very narrow application and a very specific set of government systems.

### 3.    Softech intended for the VA to own a copy the Software

In determining the licensor's intent, the relevant intent is the licensor's objective intent at the time of the creation and delivery of the software as manifested by the parties' conduct. *Nelson-Salabes, Inc. v. Morningside Development, LLC,* 284 F.3d 505, 516 (4th Cir. 2002). Courts generally focus on "objective evidence" showing the intent of the parties to determine if an implied license exists.  *See, e.g. Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1235-1236 (11th Cir. 2010).  The Fourth Circuit considers the following factors to determine the intent of the licensor, including (1) whether the parties were engaged in a short-term discrete transaction as opposed to an ongoing relationship; (2) whether the creator used written agreements providing that copyrighted materials could only be used with the creator's future involvement or express permission; and (3) whether the creator's conduct during the creation or delivery of the copyrighted material indicated that use of the material without the creator's involvement or consent was permissible.  *Nelson-Salabes,* 284 F.3d at 516.  This last prong is not limited to just

---

[10] Softech's argument that delivery of the Software did not occur until March 2010 is belied by the evidence establishing that source code was loaded onto the VA's servers throughout the parties' relationship; otherwise Softech would not have been paid $3.3 million since 2002.

copying and distributing, but will depend on the nature of the work and the protected rights that are at issue. *Id.*

While not dispositive, the *Asset Marketing* decision applied these factors in the context of a software license. *Asset Marketing Systems, Inc. v. Gagnon*, 542 F.3d 748 (9th Cir. 2008). In that case, the court found no evidence that the licensor intended to limit the licensee's rights to use the programs he created. In support of this finding, the court pointed out the following facts: (1) the licensor delivered the software without any caveats or limitations on the licensee's use of the programs; (2) the licensor programmed on-site at the licensee on the licensee's computers to which key licensee personnel had access, thus not demonstrating an intent to retain sole control; and (3) the licensor did not express an intent contrary to an implied, nonexclusive license until after the licensee had decided to terminate their 4-year relationship. *Id.* at 757. *See also Attig v. DRG, Inc.*, No. Civ.A. 04-CV-3740, 2005 WL 730681, at *6 (E.D. Pa. March 30, 2005) (finding plaintiff's failure to warn defendants at the outset that their unauthorized use would constitute infringement indicates a willingness for defendants to use materials associated with a website).

Further, if the licensor intends to retain control over its creation and limit the license granted to the licensee, the licensor must expressly state this intent. The court in *Asset Marketing* summed it up by stating, "A belated statement that the programs could not be used after Gagnon's departure, made after the termination decision and well after the creation and delivery of the programs for which substantial sums were paid, was not sufficient to negate all other objective manifestations of intent to grant AMS an unlimited license." *Id. See also Latimer*, 601 F.3d at 1235 (stating "an implied license will be limited to a specific use only if that limitation is expressly conveyed when the work is delivered"); *Numbers Licensing, LLC v.*

*bVisual USA, Inc.*, 643 F.Supp.2d 1245, 1253 (E.D. Wash. 2009) (refusing to limit a license based on statement made by licensor after relationship terminated)

Clearly, ITB and Softech were familiar with each other, and with their respective intentions regarding software developed for use by the VA. Together, ITB and Softech provided software development, updates, revisions, maintenance, and other technical services to the VA. First Am. Compl. ¶ 22. Because the Software was developed specifically for use by the VA, Softech installed it directly onto VA servers to determine operability. (A. Howard Decl. ¶¶ 29-35; C. Davis Decl.¶¶ 29-40). Upon installation, any problems or glitches would be noted by ITB and then forwarded to Softech for modification. *Id*.

Softech's case law on the issue of intent is misleading. In *John G. Danielson, Inc. v. Winchester-Conant Properties, Inc*., 322 F.3d 26, 41 (1st Cir. 2003), cited for the proposition that an ongoing relationship weighs against an implied license, the parties had a written agreement that showed the parties' intent from the beginning of the relationship to continue working together long term. Here, there is no evidence that ITB and Softech ever intended a long-term relationship, even if one ultimately developed.

Likewise, in *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 771 (7th Cir. 1996), the court found that an implied license to use drawings existed after an architect's dismissal even though the architect clearly anticipated that he was to be part of all phases of the multi-year project, not just the schematic phase. If anything, this shows that where a party can be terminated at will from a relationship, there cannot be an expectation of a long-term relationship. *See also Numbers Licensing, LLC v. bVisual USA, Inc*., 643 F.Supp.2d 1245, 1253 (E.D. Wash. 2009) (finding that contractor had more than 3 years to limit license if it had wished for it to terminate at end of relationship).

Softech argues that ITB's discussions relating to ownership of the Software at the end of their relationship proves that Softech did not intend to grant a license.  Upon termination, Softech naturally claimed more than it was entitled to receive.  However, Softech cannot produce any written evidence substantiating its position.  *See Numbers Licensing, LLC v. bVisual USA, Inc.*, 643 F.Supp.2d 1245, 1253 (E.D. Wash. 2009) (giving no weight to plaintiff's statement at time of termination that license would also terminate).  In fact, Softech has provided absolutely no evidence that it intended anything other than a continuing license throughout the course of the parties' conduct.  At any point, Softech could have reduced the license issue to writing, but it chose not to do so.  Moreover, the issue here is not what rights ITB has, but what rights were granted to the VA.  Softech loaded the source code onto the VA's servers evincing its intent that the VA was allowed to utilize, view, modify, alter, and otherwise copy the code to suit its purposes.  Softech also admits that it permitted ITB to access the servers on which the Software was maintained.  There is no truth to the idea that ITB was not "permitted" to access the Software, and Softech's argument is counter-intuitive since, during the relationship, ITB paid Softech to maintain the Software and had no reason for accessing the Software in any other capacity.

### 4.    The License Is Irrevocable

Where an implied nonexclusive license is granted, the license is irrevocable if consideration has been paid.  *Asset Marketing*, 542 F.3d at 757.  *See also Avtec Systems, Inc. v. Peiffer*, 21 F.3d 568, 574 (4th Cir. 1994) (noting license revocable only where there is no consideration paid).  A nonexclusive license supported by consideration is basically a contract and if such a contract were revocable at will, the contract would be illusory.  *Id. See also Hlotzbrinck*, 2000 WL 502860 at *5 (finding it undisputed that licensee paid licensor in excess of

$60,000 for work performed in creating a website and thus the implied license for that work product is irrevocable).

*Attig v. DRG, Inc.*, No. Civ.A. 04-CV-3740, 2005 WL 730681 (E.D. Pa. March 30, 2005), is particularly persuasive.  There, the court found an implied license for various portions of two websites, including files, graphics, and codes that defendants continued to use after separation with plaintiff, and concluded that the license was irrevocable because adequate compensation had been paid.  *Id.* at *7.  Plaintiff alleged payments had not been received for webhosting services performed after plaintiff had completed the website redesigns, and claimed that as such, defendants had no right to use anything else plaintiff had created and were therefore liable for copyright infringement.  *Id.*  The court stated, "A failure to compensate Plaintiff for webhosting services after March 2001 [the date of completion of other services] has no impact on the consideration paid for the creation of the websites and therefore the revocability of the implied license."  *Id.*  There was therefore no triable issue of fact as to whether an implied irrevocable license was created that allowed defendants to use the files, graphics and codes associated with websites at issue in the case.  *Id.*

As discussed, *supra,* Softech was adequately compensated for developing the Software and placed no restrictions on its use by the VA.  Additionally, the VA is using the Software solely for the purpose for which it was designed, and no other.  Accordingly, this compels a finding that Softech granted the VA a nonexclusive license in the Software, for which it paid adequate consideration.  Since the VA, through ITB, is not using the Software outside the scope of the implied license, Softech's claims are simply invalid.

### III.      SOFTECH CANNOT PROVE IRREPARABLE HARM

Softech claims that irreparable harm must be presumed in the presence of a valid copyright.  This is simply no longer the case in light of the Supreme Court's decision in *Ebay* and *Winter*, which dramatically narrowed the presumptions available to a preliminary injunction movant. S*ee eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006); *Winter v. Natural Resources Defense Council, Inc.*, 129 S. Ct. 365 (2008).  *See also Salinger v. Colting*, 607 F.3d 68, 79 -80 (2d Cir. 2010) (holding the presumption in copyright cases does not comport with the notions of equity set forth in *Ebay* and *Winter.)*  As explained in *Salinger,* under *Ebay and Winter,* courts in copyright cases must:

> actually consider the injury the plaintiff will suffer if he or she loses on the preliminary injunction but ultimately prevails on the merits, paying particular attention to whether the "remedies available at law, such as monetary damages, are inadequate to compensate for that injury."

*Id.* citing *eBay*, 547 U.S. at 391 and *Winter*, 129 S. Ct. at 375.  This Court recently acknowledged the shift in the law in *EMI April Music, Inc. v. White*, 618 F.Supp.2d 497, 509 (E.D. Va. 2009), refusing to apply the presumption in a permanent injunction context even after the copyright had been determined valid and infringement was established.

Softech acknowledges that irreparable harm cannot exist if Softech's alleged injury can be addressed by monetary damages, but makes no effort to explain how it could not be compensated by renewed payment of its alleged "license fee" in the event that it prevails in this case.  (Softech memorandum at 26).  Instead, it relies on a decision from this Court that dealt with an injunction to preclude a restaurant from allowing bands to perform copyrighted music without a license.  *White*, 618 F.Supp.2d at 510.  There the Court noted the difficulty inherent in

monitoring a single restaurant every night of the year. *Id.* This is quite different from the case at bar, where the only possible use for the Software is at the VA.

As this court has held:

> [H]istorically, and even today, the main prerequisite to obtaining injunctive relief is a finding that plaintiff is being threatened by some injury for which *he has no adequate legal remedy.*

*Lawler v. Schumacher Filters America, Inc.* 832 F. Supp. 1044, 1053 (E.D.Va. 1993) *quoting* 11 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure: Civil* § 2942 (1973) ("There is no power the exercise of which is more delicate, which requires greater caution, deliberation, and sound discretion, or more dangerous in a doubtful case, than the issuing [of] an injunction; it is the strong arm of equity, that never ought to be extended unless to cases of great injury, where courts of law cannot afford an adequate or commensurate remedy in damages"). Softech can be adequately compensated from a license fee if it prevails in this case, and thus an injunction is not warranted.

Finally, it is important to note that Softech's own conduct -- **waiting almost 9 months to file this motion** -- belies the "irreparable" nature of its alleged harm. A delay in seeking a preliminary injunction may "indicate an absence of the kind of irreparable harm required to support a preliminary injunction." *See Provident Pharmaceutical, Inc. v. Amneal Pharmaceuticals, LLC*, 2008 WL 3843505 at *3 (E.D.Va. 2008) (*citing Quince Orchard Valley Citizens Ass'n, Inc. v. Hodel,* 872 F.2d 75, 80 (4th Cir. 1989) (explaining that when "an application for [a] preliminary injunction is based upon an urgent need for the protection of [a] [p]laintiff's rights, a long delay in seeking relief indicates that speedy action is not required")).

Softech alleges that it received notifications from the VA that the CDN v.9.6.6 and LC Software was being updated and maintained by the VA **in April 2010**. Only now, almost nine

months after it claims to have learned of the alleged infringement, does Softech seek injunctive relief.

## IV.      THE BALANCE OF HARDSHIPS TIPS IN ITB'S FAVOR

Softech has been fully compensated for the Software.  Further, because Softech does not have a contract with the VA, and ITB is unable to use the Software for anything other than at the VA, there is no hardship to Softech if no injunction is issued because there is no chance of Softech losing customers to ITB.  *See, e.g. Universal Furniture Intern., Inc. v. Collezione Europa USA, Inc.*, 196 Fed. App'x 166, 172 (4th Cir. 2006).

On the other hand, an injunction would be debilitating to the VA's software infrastructure.  (See A. Howard Decl. ¶ 48-50; C. Davis Decl. ¶ 55-57.)  While Softech claims that ITB can develop code to replace the Software, such a development cannot happen overnight, and the VA would be left with non-functioning systems during that period.  Requiring ITB to disable the working code would also place ITB in breach of its software servicing contracts prior to an actual adjudication that ITB is acting outside the scope of the license.  This would damage ITB's relationship with its most important customer and potentially ruin opportunities for future contracts.  For this reason, the balance of hardships tips decidedly in ITB's favor.  *See, e.g. Universal Furniture Intern., Inc. v. Collezione Europa USA, Inc.*,  196 Fed. App'x 166, 172 (4th Cir. 2006) (where plaintiff potentially stood to lose sales and reputation and defendant stood to lose contracts and injure reputation, hardships were in equipoise).  *See also LucasArts Entertainment Co. v. Humongous Entertainment Co.*, 815 F. Supp. 332, 338 (N.D. Cal. 1993) (balance of hardships tipped in favor of licensee where plaintiff could recover damages and defendant's reputation with its customers was at stake).  In those circumstances, as in this one, a court having found the balances in equipoise (or favoring the non-movant) must apply a

heightened standard and require an even stronger showing of likelihood of success on the merits.

*See Universal Furniture,* 196 Fed. App'x. at 172.

## V.   THE PUBLIC INTEREST WEIGHS AGAINST INJUNCTIVE RELIEF

Softech cites numerous cases for the proposition that the public interest is served by upholding copyrights. However, Softech's cited case law,[11] does not address a situation where the licensee is a government agency and the licensor is trying to revoke the license after being paid. If anything, the public has an interest in ensuring that government money is spent on useable goods and services. Here, the VA paid Softech over $3.3 million for the development of the software, for a license, and for related maintenance services. An injunction would hamstring the operations of the VA, which is in itself a public agency. Weighing this against the few months that Softech could conceivably be deprived of its alleged license fee does not suggest that an injunction at this stage would serve the public interest.

---

[11] Softech's claim that the *Candle Factory* case holds that a finding of a valid copyright creates a presumption that the defendant will not suffer harm misrepresents the holding in that case, which states nothing about a "presumption" and which expressly analyzes the likelihood of harm to the alleged infringer. *See Candle Factory, Inc. v. Trade Associates Group, Ltd*., 23 F. App'x 134 (4th Cir. 2001) (unpublished). Likewise, the *Bowe* case involved the use of copyrights in conjunction with stolen trademarks that was likely to confuse the public. That case had the added wrinkle of non-compete clauses that were being violated by infringement on the copyrights. *See Bowe Bell & Howell Co. v. Harris*, 145 Fed. App'x 401, 403 (4th Cir. 2005) (unpublished). That is not the case here, where the only customer is the VA, who is aware of, and has made an appearance in this suit.

**VI.     CONCLUSION**

For all the reasons stated above, ITB respectfully requests that Softech's Motion for

Preliminary Injunction be denied.

January 10, 2011                                Respectfully Submitted,


                                                _____/s/_____
                                                Rhett Petcher (VSB #65826)
                                                Counsel for Internet Technology
                                                Broadcasting Corporation
                                                Seyfarth Shaw LLP
                                                975 F Street, N.W.
                                                Washington, DC  20004
                                                Telephone: (202) 463-2400
                                                Facsimile:  (202) 828-5393
                                                rpetcher@seyfarth.com

                                                Matthew S. Nelles  (*Pro hac vice*)
                                                **BROAD AND CASSEL**
                                                Counsel for Internet Technology Broadcasting
                                                Corporation
                                                100 SE 3rd Avenue, Suite 2700
                                                Fort Lauderdale, FL 33394
                                                Phone: 954-764-7060 Fax: 954-761-8135
                                                mnelles@broadandcassel.com

**CERTIFICATE OF SERVICE**

I hereby certify that on the 10th day of January, 2011 a copy of the foregoing was served on the following via the court's ECF system:

M. Keith Blankenship, Esq.
John A. Fraser, III
Attorneys for Plaintiff
General Counsel, P.C.
6862 Elm Street Suite 800
McLean, VA 22101


Adrien C. Pickard
David Alan Warrington
Philip J. Harvey
Fiske& Harvey, PLLC
100 N. Pitt St., Suite 206
Alexandria, VA 22314


By:_____/s/_____
Rhett Petcher (VSB #65826)
Counsel for Internet Technology Broadcasting
Corporation
Seyfarth Shaw LLP
975 F Street, N.W.
Washington, D.C.  20004
Telephone: (202) 463-2400
Facsimile:  (202) 828-5393
rpetcher@seyfarth.com

13042554v.1