IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

Softech Worldwide, LLC,           )
                                  )
        Plaintiff,                )
                                  )
        v.                        )   1:10cv651 (JCC)
                                  )
Internet Technology               )
Broadcasting Corp., et al.,       )
                                  )
        Defendants.               )

**M E M O R A N D U M   O P I N I O N**

        This matter is before the Court on plaintiff Softech
Worldwide, LLC's ("Plaintiff" or "Softech") motion for a
preliminary injunction preventing defendants Internet Technology
Broadcasting Corp. ("ITBC") and Fedstore Corp. ("Fedstore")
(together, "Defendants") from violating copyrights in certain
software.  For the following reasons, the Court will deny the
motion.

**I. Background**

        The parties present starkly differing versions of the
facts.  Softech calls itself a "premier provider of streaming
media software platforms," which "developed" a series of
software programs at the behest of ITBC for use by the United
States Department of Veterans Affairs (the "VA"), only to have

its software code and services to the VA stolen and its services unpaid for by ITBC.  ITBC, meanwhile, calls Softech a "rogue sub-subcontractor" that did little "creating" of software, but instead merely integrated pre-existing pieces of VA software with each other, creating largely unusable--and unused--work product.

In either case, Softech's work for ITBC involved seven pieces of software that were intended to assist the VA in electronically distributing training materials to its staff. This software included two upgrades to the VA's Content Delivery Network ("CDN"), called CDN.NET and the Digital Media Architecture ("DMA"), respectively.  In addition, Softech worked on the Employee Data Record ("EDR"), the Learning Catalog ("LC"), the Learning Management System ("LMS"), and the Very Small Aperture Terminal ("VSAT").

Softech claims that ITBC owes it money for developing this software, and that ITBC commandeered its source code and is continuing to receive payment for modifying and maintaining Softech's software for the VA, pursuant to a subcontract with Defendant Fedstore, which is the primary contractor with the VA.

Softech sued Defendants for copyright infringement before this Court on June 10, 2010.  ITBC, meanwhile, is suing Softech in Florida state court.  ITBC moved to dismiss or transfer the instant case to the Middle District of Florida on

July 8, 2010. [Dkts. 5, 6.]  This Court denied the motion to dismiss and provisionally denied the motion to transfer venue on August 23, 2010.  [Dkt. 21.]

Plaintiff moved for a preliminary injunction on December 22, 2010.  [Dkts. 82, 83 ("Mot.").]  Defendant ITBC responded in opposition on January 10, 2011.  [Dkt. 95 ("Opp.").]  Defendant Fedstore responded in Opposition on January 13, 2011.  [Dkt. 99 ("F. Opp.").]  Plaintiff replied in support to ITBC's opposition on January 18, 2011 [Dkt. 102 ("Reply")], and to Fedstore's opposition on January 19, 2011 [Dkt. 105 ("F. Reply")].  Plaintiff's motion for a preliminary injunction is before the Court.

### III. Analysis

"A preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter v. Natural Res. Def. Counsel*, 129 S. Ct. 365, 376 (2008).  "In each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'"  Id. (citing *Amoco Prod. Co. v. Gambell*, 480 U.S. 531 (1987)).  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his

favor, and that an injunction is in the public interest." *Id.*
at 374. The Court will address each of these elements in turn.

### A.   Likelihood of Success on the Merits

To state a claim for copyright infringement, a
Plaintiff must allege both (1) ownership of a valid copyright
and (2) copying of the original elements of the material by the
defendant. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,* 499
U.S. 340, 361 (1991); 17 U.S.C. § 501. Regarding ownership, a
certificate of registration from the United States Copyright
Office is prima facie evidence of a copyright's validity.
*Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc.*,
618 F.3d 417, 428 (4th Cir. 2010). When such a certificate
exists, the burden shifts to the defendant to prove that the
claimed copyrights are invalid. *Id.* "However, the Copyright
Office's practice of summarily issuing registrations . . .
counsels against placing too much weight on registrations as
proof of a valid copyright." *Id.* "Accordingly, a reviewing
court should assess other relevant indicia of ownership." *Id.*

Here, Softech has presented certificates of
registration for the software at issue. [Dkt. 11, Attachment 1,
Ex. C.] Defendants do not appear to challenge these
registrations.

4

## 1. Copying of Copyrighted Material

"The term 'copying' is interpreted broadly and encompasses the infringing of any of the copyright owner's five exclusive rights." *U-Haul Int'l, Inc. v. WhenU.com, Inc.*, 279 F. Supp. 2d 723, 729 (E.D. Va. 2003). Those exclusive rights include reproduction, distribution, public performance, public display, and, important here, derivative use. 17 U.S.C. § 106. Here, Softech alleges violations of its exclusive rights to distribution, reproduction, and derivative use. But Softech is not specific regarding which pieces of software have been copied.

ITBC claims that "the software, and source code developed by Softech for EDR, LMS, CDN.NET and VSAT is unusable, unreliable, incomplete, and defective 'deadware,' which ITB has never maintained or copied." (Opp. at 10.) At least with respect to EDR, LMS, and VSAT, Softech presents no clear evidence disputing this claim.[1] Thus, this Court cannot find copyright violations as to these pieces of software, and therefore will deny the requested injunction with respect to them.

---

[1] In its reply, Softech cites to two memoranda that, according to the Reply, "detail[] the status of previous, and the potential for future, copying and modification of Softech's LMR and EDR software." (Reply at 4.) Upon reviewing the memoranda, it is not entirely clear that the memoranda rebut ITBC's claims. Given the Court's reasoning in disposing of the Motion, however, this is immaterial.

That leaves CDN, CDN.NET, DMA, and LC.  With respect to CDN.NET and DMA, neither appear to have been implemented, but Softech claims that ITBC has viewed the source code for both programs, and is planning to design its own iteration of these programs for the VA, which Softech presumably claims would constitute copying by creation of a derivative work.  That claim *may* be legally cognizable depending on what is eventually created, but Softech presents no *evidence* that this future work would likely constitute a "copy," as opposed to original work, and therefore fails to meet the standard necessary for a preliminary injunction.  This Court will therefore deny Softech's motion with respect to CDN.NET and DMA.

Thus, only CDN and LC remain at issue.  ITBC admits that it maintains these programs on behalf of and as authorized by the VA, but claims protection under the "essential step" defense authorized by 17 U.S.C. § 117(a).  (Opp. at 11.)  That provision provides, in relevant part:

> [I]t is not an infringement for the owner of a copy of a computer program to make *or authorize the making* of another copy or adaptation of that computer program provided:
>
> (1) that such a new copy or adaptation is created as an essential step in the utilization of the computer program in conjunction with a machine and that it is used in no other manner.

(emphasis added).

Thus, to qualify for this affirmative defense, ITBC must prove that its work involving CDN or LC (i) was authorized by the owner of a copy of the computer program, (ii) was created as an essential step in using that program in conjunction with a machine, and (iii) was used in no other manner. *Krause v. Titleserv, Inc.*, 402 F.3d 119, 122 (2d Cir. 2005).

### i. Ownership of a Copy

Section 117(a) provides little textual guidance for determining legitimate ownership in a copy of software. *Id.* And the Fourth Circuit has not announced a test for ownership under that provision. *See Madison River Mgmt. Co. v. Business Mgmt. Software Corp.*, 387 F. Supp. 2d 521, 538 n.12 (M.D.N.C. 2005) (declining to adopt a test for ownership).[2]  This Court is convinced, however, by the Second Circuit's reasoning in *Krause v. Titleserv*, in which the Court overturned a rule requiring formal title to establish ownership, and instead adopted a rule looking for "incidents of ownership."  402 F.3d at 123-24.  In particular, this Court is swayed by the Second Circuit's observation that "it seems anomalous for a user whose degree of ownership of a copy is so complete that he may lawfully use it

---

[2] This Court notes that the Middle District of North Carolina described there being a circuit split between *Krause* and *DSC Comm'ns Corp. v. Pulse Comm'ns, Inc.*, 170 F.3d 1354 (Fed. Cir. 1999), which it claimed adopted a "formal title test."  Upon closer inspection of *DSC*, it appears not to have adopted such a test.  Rather, like many cases, it looked towards restrictions created by licensing agreements to determine whether the possessor of a copy was an owner, finding that those restrictions precluded ownership. *Id.* at 1362.

and keep it forever, or if so disposed, throw it in the trash, to be nonetheless unauthorized to fix it when it develops a bug, or to make an archival copy as backup security." *Id.* at 123. Thus, this Court looks for incidents of ownership for the purposes of § 117(a).

The facts of *Krause* are similar to the instant case. Krause was a software developer who, absent any written agreement, wrote programs for Titleserv that were installed on Titleserv's computer network and accessible to its employees. *Id.* at 120.  When he left Titleserv after receiving substantial compensation, he left executable versions of the programs on Titleserv's computers, but asserted that Titleserv had no right to modify the source code, even for routine changes and repairs to keep the system operable.  *Id.* at 120-21.  He "locked" the source code but Titleserv employees circumvented the lock and modified the code.  *Id.* at 121.

The Second Circuit found Titleserv protected as an "owner" under § 117(a) for a number of reasons:

> Titleserv paid Krause substantial
> consideration to develop the programs for
> its sole benefit. Krause customized the
> software to serve Titleserv's operations.
> The copies were stored on a server owned by
> Titleserv. Krause never reserved the right
> to repossess the copies used by Titleserv
> and agreed that Titleserv had the right to
> continue to possess and use the programs
> forever, regardless whether its
> relationship with Krause terminated.

8

> Titleserv was similarly free to discard or
> destroy the copies any time it wished.

*Id.* at 124.

Likewise, here, Softech presents no evidence contradicting the allegations that the VA (through ITBC) paid Softech substantial consideration (nearly $3.3 million) to develop software for its benefit; the software was customized to serve and integrate with the VA's pre-existing software; the software was installed on the VA's servers; no evidence exists that Softech reserved the right to repossess its work product; and the VA was free to discard Softech's software at any time. (Opp. at 14-15 (citing A. Howard Decl. ¶¶ 31, 32; C. Davis Decl. ¶¶ 34, 35, 36, 37, 38, 39).) Thus, for the purposes of § 117(a), the VA was an owner of a copy of the CDN and LC, and was therefore entitled to authorize the making of a copy of its software where doing so would fulfill an essential step in its utilization.

### ii. Essential Step

This Court therefore turns to the question under § 117(a) of whether ITBC's modification of the CDN and LC programs is an "essential step in the utilization of [those] program[s] in conjunction with a machine." And in *Krause*, the Court explained that this test is met where the adaptations at issue were "essential to allow use of the program[s] for the very

9

purpose for which they were purchased." 402 F.3d at 125
(citation and internal quotation marks omitted). The
adaptations at issue in *Krause* were (1) fixing "bugs," (2)
changing source code to add new clients and client information,
(3) incorporating the programs into Titleserv's Windows-based
system, and (4) adding capabilities like the ability to print
checks and to allow customers to access their records. *Id.* at
125-26. The Court found these modifications essential, not
because they were essential to make the software *work*, but
because they were necessary to make the software *helpful* or
worth using. *Id.* at 126-27.

        The modifications here appear similar. Again Softech
presents no evidence disputing ITBC's assertions that its
modifications of the CDN and LC software consist of "debugging
and routine modifications (as directed by the VA) to support
existing functions, or support changes in business needs."
(Opp. at 15.) The alleged examples of ITBC's modifications seem
no less essential to the VA's operation of the software than
those at issue in *Krause*. They allegedly include:

> (1) changing a web page to reflect the new
> "video of the week" and other cosmetic web
> page changes; (2) adding new field user
> account databases at the VA's request; (3)
> restarting a software process if it locks
> up or fails; (4) correcting software
> defects ("bugs") introduced in version
> 9.6.6 of the CDN Software as they are
> identified by VA users; (5) creating a new

> database field to support a VA reporting
> requirement (for instance, a reporting
> requirement as to "how many staff watched
> the 'Patient Privacy' video in the western
> region); (6) identifying and fixing content
> library errors such as the appearance of
> duplicate videos; (7) performing regular
> "integrity checks" of the database to
> insure that it is not corrupt; (8) fixing
> programs that may break when a Microsoft
> Patch is applied to the server; and (9)
> performing other routine tasks necessary to
> keep the programs up-to-date and to
> maintain their usefulness to the VA.

(Opp. at 15.)

As in *Krause*, these modifications appear essential to CDN and LC remaining useful programs for the VA.  This Court therefore finds this step of the essential-step defense met.

### iii. Use Of The Software In No Other Manner

The remaining essential-step factor, then, is that the copy of the software must be "used in no other manner" than that envisioned in the creation of the program.  *Krause*, 402 F.3d at 129; 17 U.S.C. § 117(a)(1).  "What is important is that the transaction for which the programs are used is the type of transaction for which the programs were developed."  *Id.* at 130. And here, Softech presents no evidence that, as a matter of functionality, its software is being used for any purposes other than those originally intended.  Thus, the essential-step defense appears likely to apply in this case.

2. Likelihood of Success on the Merits as to
   Fedstore

Although Plaintiff seeks a preliminary injunction as to both ITBC and Fedstore, Fedstore is correct in arguing that Plaintiff's arguments as to Fedstore are "no more than a meritless afterthought." (F. Opp. at 1.)  Softech made no argument in its initial brief with respect to Fedstore, addressing Fedstore only in its reply to Fedstore's opposition.  Fedstore argues that it has "never seen, touched, had in its possession, or otherwise copied Softech's allegedly copyrighted software while under contract with the VA." (F. Opp. at 2.)  Indeed, the only remaining against Fedstore is for vicarious liability for copyright infringement. (F. Opp. at 3.)

To establish vicarious liability for copyright infringement, "a copyright owner must demonstrate that the entity to be held so liable: (1) possessed the right and ability to supervise the infringing activity; and (2) possessed an obvious and direct financial interest in the exploited copyrighted materials." *Nelson-Salabes, Inc. v. Morningside Dev., LLC*, 284 F.3d 505, 513 (4th Cir. 2002) (citations omitted).  Vicarious liability for copyright infringement serves the important public interest of "prevent[ing] an entity that profits from infringement from hiding behind undercapitalized

'dummy' operations when the copyright owner eventually sues."
*Id*.

Fatal to Softech's Motion with respect to Fedstore is the Court's finding that Softech has not shown a likelihood of success on the merits of its infringement claim against ITBC. It is axiomatic that one cannot be vicariously liable for copyright infringement when there is direct liability for infringement. Because, for the reasons set forth above, Softech has not shown a likelihood of success with respect its infringement claim, it cannot show a likelihood of success on the merits of its claim for vicariously liability for that same alleged infringement. *See Miller v. Facebook, Inc.*, No. C10-00264, 2010 WL 2198204, at *4 (N.D. Cal. May 28, 2010) ("Secondary liability for copyright infringement does not exist in the absence of direct infringement by a third party.") (quoting *A & M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 n.2 (9th Cir. 2001)).  Accordingly, this Court will deny Softech's motion with respect to Fedstore.

*         *         *

Thus, this Court finds that there is not a substantial likelihood that Softech will succeed on the merits in this case, and will therefore deny a preliminary injunction.

3. Irrevocable Implied License

ITBC further argues that, even if it is not protected by the essential-step defense, Softech granted an implied nonexclusive license to the copyrights associated with its software, precluding liability.  Such a license may be implied from conduct, and does not transfer ownership of a copyright, but "simply permits the use of a copyrighted work in a particular manner." *Nelson-Salabes, Inc.*, 284 F.3d at 514 (quoting *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 775 (7th Cir. 1996)).  And the existence of such a license is an affirmative defense to an allegation of copyright infringement. *Id.*  The burden for proving the existence of a license is on the purported licensee. *John G. Danielson, Inc. v. Winchester-Conant Props., Inc.* 322 F.3d 26, 40 (1st Cir. 2003).

An implied nonexclusive license is created when:

(1)  The licensee requests the creation of a work;
(2)  The licensor makes that particular work and delivers it to the licensee who requested it; and
(3)  The licensor intends that the licensee copy and distribute the work.

*Id.*

Beginning with the first factor, the parties agree that ITBC requested that Softech develop certain software for the VA. (Mot. at 20; Opp. at 19.)  This factor is therefore met.

14

On the second factor, the parties agree that Softech delivered its work product to the VA, but disagree as to whether this satisfies the requirement that delivery be made "to the licensee who requested it." (Mot. at 20; Opp. at 20.)  The question is whether delivery to the VA, as the principal for whom ITBC performs duties as a subcontractor, counts as delivery to the party that requested the software (*i.e.*, ITBC).

It is true that courts are skeptical when delivery is made to a third party.  *See, e.g.*, *Berg v. Symons*, 393 F. Supp. 2d 525, 544 (S.D. Tex. 2005).  But it is a different situation where the third party is a general contractor for the recipient of the delivery, and the licensor is a subcontractor to that general contractor.  In such an instance, it is immaterial which party actually receives the work product, because the contractor's request is essentially also the principal's request.  *See Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224 (11th Cir. 2010) (fact that delivery was made to general contractor instead of principal was immaterial, both were granted implied licenses).  Here, Softech knew that ITBC's request for the software was effectively the VA's request.  Delivery to the VA versus ITBC therefore demonstrates little with respect to this factor.  This factor is therefore met.

The third factor--intent--presents more difficulty for this Court at this stage, given the information currently

available.  In determining whether the licensor intended to

grant access another party, this Court considers such factors as

(1) whether the parties were engaged in a short-term discrete

transaction as opposed to an ongoing relationship; (2) whether

the creator used written agreements providing that copyrighted

materials could only be used with the creator's future

involvement or express permission; and (3) whether the creator's

conduct during creation or delivery of the copyrighted material

indicated that the material could be used without the creator's

involvement or consent. *Nelson-Salabes,* 284 F.3d at 516.  This

list is not exhaustive; the touchstone is intent. *Danielson*,

322 F.3d at 40.

A long-term relationship between the parties typically

counsels against the existence of a license, because it shows

the licensor's intent to remain involved in the job.  *Id.* at 41.

ITBC points out that whereas it was clear from the parties'

written agreement in *Danielson* that a long-term relationship was

envisioned, no such evidence exists in this case.  But,

critically, the burden of proof here lies with ITBC as the

putative licensee.  *See Danielson*, 322 F.3d at 40.  The absence

of evidence therefore cannot equate to the existence of a

license.

Indeed, with respect to all the *Nelson-Salabes*

factors, too little evidence is before this Court to find that

Softech intended to grant a license to ITBC.  The relationship
was long-lasting, there were no written contracts, and there is
no Softech conduct indicating a desire that ITBC (as opposed to
the VA) be granted any independent freedoms with respect to the
software.

ITBC argues that this Court should follow the Ninth
Circuit's reasoning in *Asset Marketing Systems, Inc. v. Gagnon*,
542 F.3d 748 (9th Cir. 2008).  There, the Court found no
evidence that the licensor intended to limit the licensee's
rights, noting that the licensor delivered the software to the
licensee without any caveats, the licensor programmed on-site on
the licensee's computers, and the licensor did not protest the
existence of a license until the licensee terminated the
relationship.  *Id*. at 757.  The point is well taken that it may
be all too convenient to protest use of a program *after* a
business relationship turns sour.  *See id.*  Still, *Asset
Marketing* differs from the instant case in that it involves a
two-party relationship, unlike here, where ITBC stood between
Softech and the VA, making Softech's intent with regard to ITBC
difficult to discern.

B.   Likelihood of Irreparable Harm

The likelihood of irreparable harm absent a
preliminary injunction in this case is questionable.  It is
true, on one hand, that damages from copyright infringement

17

often include an intangible component that cannot be cured by
damages alone.  Indeed that proposition can be found in two
recent cases in this District: *EMI April Music, Inc. v. White*,
618 F. Supp. 2d 497, 510 (E.D. Va. 2009), and *Splitfish AG v.
Bannco Corp.*, --- F. Supp. 2d ---, 2010 WL 2928510, at *6 (E.D.
Va. July 22, 2010).  Yet these cases are readily distinguished
from the instant case.

 The plaintiffs in *EMI* sought an injunction to prevent
a restaurant from permitting bands to perform copyrighted songs
without a license.  618 F. Supp. 2d at 510.  Noting that, "once
a song has been played and heard, it is difficult to conceive of
how such harm can be remedied," the Court found a likelihood of
irreparable harm established.  *Id.*  The plaintiffs in *Splitfish*
sought an injunction to prevent the defendants from selling a
videogame controller device that allegedly contained illegal
copies of Plaintiffs' computer programming code.  2010 WL
2928510, at *1.  And the Court remarked that allowing the
defendants to continue doing this "would significantly diminish
the intangible value of the work to plaintiffs in a manner that
could not be cured by damages alone."  *Id.* at *6.

 Here, the software at issue is not for sale on the
open market.  There is no risk of its cheapening through
dissemination, because, at least to this point, no dissemination
has occurred.  Because the software's only possible use appears

to be for the VA, this Court is confident that an adequate
remedy at law can be provided for any infringement by ITBC.
Moreover, this Court must note that Softech waited six months to
seek injunctive relief after filing suit in this case, raising
additional doubt as to the immediacy of potential harm occurring
here.

For these reasons, the likelihood of irreparable harm
in this case does not warrant an injunction.

### C.   Balance of Equities

As explained in this Court's essential-step analysis,
*supra*, ITBC's work in servicing the software in this case is
essential to that software's useful functioning for the VA.
Thus, if ITBC were barred from performing that work, the VA
would suffer harm to its software infrastructure.  Balanced
against this, on Softech's side, is the possibility of reparable
harm.  *See* Part III(C), *supra*.  Weighing these outcomes, this
Court finds the balance tipped in ITBC's favor.

### D.   The Public Interest

Finally, while it is true that the public interest is
served by "upholding copyright owners' exclusive statutory
rights to control the use of their work," *Splitfish*, 2010 WL
2928510, at *7, it is unclear that an injunction *now* would
better serve the public than to permit the Veterans'
Administration to continue unhampered until this matter is

resolved.  For the same reasons that the equities counsel

against an injunction, the public interest does as well.

### IV.  Conclusion

For the reasons stated above, the Court will deny

Softech's Motion.

An appropriate Order will issue.


|                      |  /s/                                |
|----------------------|-------------------------------------|
| January 24, 2011     |       James C. Cacheris             |
| Alexandria, Virginia |  UNITED STATES DISTRICT COURT JUDGE |